Seng Waterway Warehouse Company v. Commissioner.
Seng Waterway Warehouse Co. v. Commissioner
Docket No. 3439.
United States Tax Court
1945 Tax Ct. Memo LEXIS 135; 4 T.C.M. (CCH) 681; T.C.M. (RIA) 45223; June 28, 1945
*135 Harry Thom, Esq., 231 S. LaSalle St., Chicago 4, Ill., for the petitioner. David F. Long, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioner's income tax, declared value excess-profits tax, and excess-profits tax for the calendar year 1941, in the respective amounts of $3,466.60, $909.93, and $5,576.08. The question presented is whether or not respondent erred in disallowing the deduction by petitioner of certain amounts paid its officers in 1941 as compensation for personal services on the ground that they were in excess of a reasonable allowance therefor. Findings of Fact A partial stipulation of facts was filed, and the facts contained therein are found to be as sitpulated, and are incorporated in these findings to the extent to which they are necessary to an understanding of the issue. Petitioner is an Illinois corporation, which kept its books and filed its income tax returns on an accrual basis for the calendar year. It filed its income and declared-value excess profits tax return and excess-profits tax return with the collector of internal revenue for the first district of *136 Illinois, at Chicago. During the year involved, petitioner's issued and outstanding capital stock consisted of 1,250 shares of no par value common stock with a stated value of $20 per share. It was owned from 1937 through 1941, as follows: Shares
Name
Title
owned
Percentages
J. J. Egan
Vice Pres. & Sec.
408 1/2
32.68
J. F. Seng
President
312 1/2
25.00
V. J. Seng
Treasurer
162 1/2
13.00
Margaret Seng
(Wife of Treas.)
162 1/2
13.00
Marguerite Schlitt
Asst. Secretary
204
16.32
1250
100.00
The directors of petitioner during 1937 to 1941, inclusive, were J. J. Egan, J. F. Seng and V. J. Seng. Petitioner was organized in 1934. It leased a fourteen story warehouse located on the west bank of the Chicago River at Polk Street, near the center of Chicago's downtown business district. The building is well constructed of reinforced concrete faced with brick, and so located that it can receive freight by water, rail or truck. It is owned by the Pennsylvania Railroad, and had been vacant for six years before petitioner secured it, although offers had been made by other concerns for its use. V. J. Seng and J. F. Seng had been engaged *137 in the trucking and storage business in Chicago for many years, and had wide business contacts and excellent reputations in that field. J. J. Egan and Marguerite Schlitt had been associated for a number of years with a national service organization dealing with warehouses and distribution centers throughout the United States, and were well and widely acquainted with the business and the personnel in the warehousing field. In 1940, petitioner leased an additional adjacent building, so that during 1941 it operated warehousing space totaling 617,000 square feet, and paid a rent of approximately $70,000. When petitioner was organized in 1934, the warehouse business was depressed, and highly competitive. Petitioner's officers believed that warehousing, and the economy of distributing through public warehouses had never been properly presented to many large potential users. They determined to offer sales and traffic service to their customers, and to sell them on the idea of dispensing with local branches of their own by utilizing the services offered by petitioner. Petitioner also loaded ships for direct shipment to Europe, thus establishing a reputation with steamship lines. The business *138 has been built up from an original capital of $2,000 and sixteen cases of assorted merchandise in 1934, largely through the personal contacts and business reputations of the Sengs and Egan. It now serves a majority of the large nationally known corporations shipping merchandise into Chicago. The operation of a warehouse is a specialized business with its own peculiar hazards. Merchandise must be stored to guard against infestation, temperature changes, odor contamination, theft, fire, and other damage. It requires a knowledge of traffic matters, rate structures, etc. The stevedoring operations, which are an integral part of the business, supervised by Egan and John Seng, require special knowledge of the handling of merchandise, and special equipment, some of which has been developed by petitioner's officers for its own use. It involves a certain skill in labor relations. During 1941, petitioner's regular working hours extended from 7:45 a.m. to 6:00 p.m. Since the business was based to a substantial extent on personal service, the officers were more or less on call at night and on Sundays. During 1941, John J. Egan devoted his full time during business hours to petitioner's business, *139 as well as many evenings, and a part of every Sunday when he was in the city. His duties included the personal contacting of customers and prospective customers, and selling the special services which petitioner could best offer; the supervision of the maintenance of the buildings and equipment; labor relations, including the negotiating of new union contracts; securing daily transient labor crews; traveling in the interests of petitioner, and generally supervising the business and activities of petitioner. John F. Seng, petitioner's president, had been in the trucking and warehousing business for about twenty-five years. His duties included the supervision of sales, conferring with the other officers and employees about operating problems, building maintenance problems, and assuming full responsibility when Egan was out of the city. In addition to his duties for petitioner, John Seng was president of Seng Terminal Warehouse Company and an officer of V. Seng Teaming Company, both of which corporations were organized by him and his father prior to the organization of petitioner. He was paid $2,860 for his services to Seng Terminal Warehouse Company in 1941, and $5,200 by V. Seng Teaming *140 Company. He spent more time with petitioner than with the other corporations, and, since he devoted many evenings and Sundays to petitioner, he spent almost a normal full time in petitioner's service. Val J. Seng, petitioner's treasurer, had been in the teaming, trucking and warehouse business for approximately 55 years. He was widely and favorably known in the business, in which he had enjoyed substantial success. Although he was about seventy years old in 1941, he was present at the warehouse every week day, contacted customers, signed checks, and advised the younger men in the conduct of the business generally. He was also an officer of Seng Terminal Warehouse Company and V. Seng Teaming Company, which he founded in 1889. He was paid, in 1941, for his personal services to Seng Terminal Warehouse Company the sum of $3,000 and for his services to the V. Seng Teaming Company the sum of $10,920. Marguerite Schlitt, assistant secretary of petitioner in 1941, had been associated with the warehouse business since 1922. Before the organization of petitioner, she had been in charge of the office and books of Distribution Service, Inc., a corporation which represented large warehouses *141 in all sections of the country. She was widely known throughout the industry, and was familiar with rate structures and account analysis. She had some advertising experience. She has been with petitioner since its organization. In 1941, she had charge of rate analysis, account analysis, advertising and payroll inspection. She was office manager, signed checks, and consulted with the other officers regarding general policies. She spent full time on the business of petitioner for seven months in 1941, and two-thirds of her time during the remaining five months. In 1940, she spent only about one-fourth or one-third of her time with petitioner, for which she was paid $1,200. The salaries of petitioner's officers were authorized by the Board of Directors, which took into consideration the fact that the officers were securing new business, handling the business in a satisfactory manner, their hours were longer, new space had recently been acquired and the volume of business handled had increased. The salaries paid petitioner's officers during the years 1935 through 1941 were as follows: 1935
1936
1937
J. F. Seng
$ 6,680.00
$ 1,650.00
$10,450.00
J. J. Egan
5,766.40
8,050.00
18,950.00
V. J. Seng
6,219.20
3,712.50
P. O'Dea
4,327.20
2,500.00
Marguerite Schlitt
3,827.20
3,225.00
Jack Pinscak
3,000.00
Totals
$26,820.00
$12,200.00
$39,337.50
*142 1938
1939
1940
1941
J. F. Seng
$10,466.67
$10,800.00
$10,300.00
$16,800.00
J. J. Egan
23,200.00
19,200.00
16,700.00
27,200.00
V. J. Seng
4,800.00
1,200.00
1,200.00
7,000.00
P. O'Dea
Marguerite Schlitt
3,600.00
1,200.00
1,200.00
5,000.00
Jack Pinscak
$42,066.67
$32,400.00
$29,400.00
$56,000.00
Petitioner's gross receipts, net income before deducting officers' compensation and Federal taxes, officers' compensation, net income after officers' salaries but before Federal taxes, Federal taxes, net income after deducting officers' compensation and Federal taxes, dividends paid, and surplus at the end of the year are shown below: Net Income
Net Income
after Deduct-
ing Officers'
Compensation
Compensation
Officers'
but before
Gross
and Federal
Compen-
deducting
Year
Receipt
Taxes
sation
Federal Taxes
1935
$104,912.37
$31,538.35
$26,820.00
$ 4,718.35
1936
98,191.63
14,182.81
12,200.00
1,982.81
1937
193,206.01
51,479.11
39,337.50
12,141.61
1938
188,627.22
56,933.16
42,066.67
14,866.49
1939
173,174.33
46,917.15
32,400.00
14,517.15
1940
204,508.17
59,251.19
29,400.00
29,851.19
1941
289,440.68
94,886.28
56,000.00
38,886.28
*143 Net Income
after deduct-
ing Officers'
Compensation
Surplus
Federal
and Federal
Dividends
end of
Year
Taxes
Taxes
Paid
Year
1935
$ 569.36
$ 4,148.99
none
$ 995.22
1936
281.25
1,701.56
none
2,411.18
1937
1,983.87
10,157.74
$5,000.00
9,780.92
1938
2,006.31
12,860.18
6,250.00
13,932.57
1939
1,944.28
12,572.87
none
26,498.44
1940
7,633.85
22,217.34
5,000.00
38,341.89
1941
15,639.21
23,247.07
5,000.00
57,530.03
The salaries paid by petitioner to its officers in 1940 were reduced by agreement in order to build up a financial reserve at a time when petitioner was negotiating for the purchase of a warehouse building. The compensation which petitioner paid to its officers in 1941 was a reasonable allowance for personal services actually rendered by them. Opinion KERN, Judge: There is presented for decision here only the single question whether the salaries paid by petitioner to its officers for personal services rendered by them in 1941 were reasonable in amount. The record shows that petitioner is a service organization, depending quite substantially for its success upon the outstanding ability, *144 industry, and acumen of the individuals who conduct the business, and whose salaries are here in question. Two of the officers worked long hours, and frequently on Sunday. A third was a man of more than fifty years' experience in the general field of business in which petitioner was engaged. He had an excellent reputation in that field, and his advice and counsel were considered by the other officers to be invaluable to the corporation. He spent some part of every working day at petitioner's office, although he was otherwise engaged for a portion of his time. The fourth officer was the assistant secretary and office manager of the company who had had about twenty years' experience in the business carried on by petitioner. She was thoroughly familiar with the warehousing business and was one of the organizers of petitioner corporation. Respondent does not contend that services were not actually rendered by the officers who were also stockholders. He challenges only the reasonableness of the amounts paid for the services. The salaries paid were substantially increased over the salaries paid in 1940. Respondent depends quite heavily upon the comparison between those years. But the evidence *145 shows, and is substantiated by documents in the record, that the 1940 salaries did not and were not intended to represent the reasonable value of the officers' salaries in that year. The record clearly shows that for both 1939 and 1940, the officers were paid lower salaries by agreement of all concerned in order that the corporation might accumulate a sufficient reserve to negotiate the purchase of a warehouse, which it was then considering. While there is no apparent disposition on the part of petitioner to claim that the increases in 1941 are justified because of the inadequate salaries of 1939 and 1940, it does object to the exclusive use of those years as fair standards of comparison by which to judge the reasonableness of the 1941 salaries. In view of the evidence on that point, it seems fairer to look for guidance to the earlier years, as well as in 1939 and 1940. The statistics contained in the findings of fact disclose a very healthy state of growth from the time of its organization through the tax year. Steady and substantial gains were exhibited in gross earnings, net income, and surplus. Dividends had been paid from 1935 through 1941, totaling more than $21,000 on a capitalization *146 of $25,000. The dividend paid in the tax year amounted to a 20 percent return on the invested capital. The increase in gross receipts in 1941 over 1940, in an amount of about $85,000, was substantial and altogether satisfactory, but it was not so phenomenal as to persuade us that it was due in any decisive degree to increased shipping because of the European war, in the face of testimony that the war was but a minor contributing factor. We are convinced that the increase was due to the fact that greater warehousing space was operated by petitioner, as well as to the normal increase in petitioner's original business under the zealous management of its officers. While each of the officers involved was a stockholder, it is obvious that the payments made to them bore no relation to the amounts of stock held by them. In fact, respondent does not specifically argue that the payments were distributions of profits in disguise. As we have pointed out, the stockholders received an excellent return on their investment by way of dividends, not only in the tax year, but throughout the life of the corporation. In view of the facts shown to have existed here, where the corporation was increasingly *147 prosperous and its success was due predominantly to the personal services of the officers, rather than to the invested capital, where generous dividends were paid in the taxable year as well as in prior years, and where the quality of the services and the capability of the officers were of outstanding value to the corporation, we conclude that the respondent erred in disallowing any part of the compensation paid the officers for their personal services actually rendered. Decision will be entered under Rule 50.